IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. WR-70,152-02





EX PARTE GERONIMO RENE GUTIERREZ, Applicant




ON APPLICATION FOR A WRIT OF HABEAS CORPUS

IN CAUSE NO. 2001-CR-1577 FROM THE



227th DISTRICT COURT OF BEXAR COUNTY

 

 Alcala, J., filed a concurring statement in which Cochran, J., joined.


CONCURRING STATEMENT


 I respectfully concur in this Court's dismissal of the subsequent application for a writ
of habeas corpus filed by Geronimo Rene Gutierrez, applicant. I write separately to explain
why I conclude that the subsequent application fails to present facts that would overcome the
procedural bar on subsequent writs. See Tex. Code Crim. Proc. art. 11.071, § 5.

I. The Initial State and Federal Applications

 Applicant was convicted of capital murder and sentenced to death in 2002. This court
affirmed the judgment and sentence on direct appeal. See Gutierrez v. State, No. AP-74,341,
2004 WL 3092763 (Tex. Crim. App. April 21, 2004) (not designated for publication).

 In 2008, four years after it affirmed his conviction and sentence, this Court denied
applicant's initial application for habeas corpus relief. Ex parte Gutierrez, No. WR-70,152-01, 2008 WL 4417161 (Tex. Crim. App. Oct. 1, 2008). In that application, applicant
presented 10 claims for relief. In eight of those claims, applicant contended that he received
ineffective assistance of counsel because trial counsel failed to obtain a mitigation expert and
a psychologist, and failed to investigate and present mitigating evidence, particularly
evidence of mental retardation. The remaining two grounds alleged that applicant is mentally
retarded and that his execution would violate the federal and state constitutions.

 For evidentiary support, the initial application included an affidavit from applicant's
mother, who, according to the application, said that applicant was "in Special Education in
school; had trouble taking care of daily personal business, and had trouble getting and
keeping jobs." The initial application also presented evidence from Dr. Susana A. Rosin, a
psychologist. The writ described Dr. Rosin's affidavit as examining applicant's background
and developing extensive information that would have served as "valuable mitigating
evidence at the trial in this case. The most important mitigating evidence developed was the
fact that Applicant is mentally retarded." In describing Dr. Rosin's assessment of applicant,
the initial application stated,

 Dr. Susana Rosin outlines a childhood history of physical illnesses and
injuries, as well as signs of hyperactivity and impulsivity from early childhood. 
A review of school records reflects a history of academic and behavior
difficulties from an early age. Special Education services and psychological
evaluations began while [applicant] attended middle school. These school and
psychological records reflect a history of adaptive deficits and behavior
problems dating back to middle school. A psychological report in 1994
described Applicant as "impulsive, using alcohol to excess, oppositional,
depressed, and disrespectful to adults." Dr. Rosin conducted extensive testing
in both English and Spanish and concluded that based upon the history and
testing that Applicant met all three of the DSM-IV-TR criteria for diagnosis
of Mental Retardation. 


Dr. Rosin said applicant had a WAIS III score of 68 for verbal and a 77 for performance,
resulting in a full-scale IQ of 70. Rosin acknowledged that applicant had admitted to chronic
drug use, which would negatively affect his current test score. Furthermore, Rosin admitted
that applicant's antisocial traits increased the possibility of him having poor planning ability
and an inability to control his impulses, both of which might make applicant more likely to
pose a future danger.

 The application also included an affidavit from John P. Niland, an attorney, who said
that the prevailing professional standard at the time was to request assistance from a
mitigation expert in capital cases. The application, however, acknowledged that trial counsel
did present some evidence in the punishment phase of applicant's trial: his sister Claudia and
his mother Susana testified that he was "slow in school" and placed in special education; and
a jail guard testified that applicant was not a troublemaker and, on one occasion, had come
to his aid.

 To address the claims raised in applicant's initial habeas application, the trial court
held a live evidentiary hearing at which applicant's trial counsel testified. With respect to
applicant's claim that trial counsel should have sought the assistance of a mitigation expert,
counsel explained that he personally investigated everything about applicant, including his
background and history, prior to the punishment phase of trial. Counsel further stated that
he reviewed the district attorney's file and interviewed several individuals, including
applicant's mother and at least seven other family members and acquaintances. Trial counsel
stated that he was unable to find anyone who would testify that applicant had a "good
character." He ultimately decided to call applicant's mother and sister to testify that
applicant had never been a danger to anyone and that he had been enrolled in special
education classes when he attended school.

 Regarding his alleged failure to investigate evidence of applicant's mental retardation,
trial counsel noted that he had investigated and considered school IQ tests taken when
applicant was almost 14 years of age, which showed that applicant was not mentally retarded
and that he did not exhibit any limits in his adaptive functioning. Those school reports
showed that applicant had a verbal score of 75 and a performance score of 111, which
translated into a 91 full-scale score.

 With respect to applicant's claim that he is mentally retarded, the State presented
evidence from Dr. John Sparks, who represented that he did not believe that applicant was
mentally retarded. Though he described applicant's IQ as being between 70 and 80, Dr.
Sparks explained that applicant could have performed better on the tests if he had been
motivated to do so. Dr. Sparks opined that applicant's adaptive abilities are above the range
of retardation.

 In recommending that the mental-retardation claim be denied, the habeas court found
that applicant failed to present evidence from family or friends to establish limitations in
adaptive functioning; that the factors cited by Rosin weighed both for and against a finding
of mental retardation; that the testing results from when applicant was a child were above the
range of even mild retardation; and that the results of current testing, while closer to the
mildly-retarded range, were very likely affected by applicant's drug use and lack of
motivation. This Court adopted the trial court's recommendation and denied relief as to this
claim and the related claim that trial counsel was ineffective for failing to investigate mental-retardation evidence. Furthermore, this Court concluded that a mitigation specialist would
have been unable to uncover any additional or different information than the information
uncovered by trial counsel, and that, therefore, trial counsel was not ineffective for failing
to secure the assistance of a mitigation expert.

 After the culmination of the state proceedings, applicant sought post-conviction relief
in federal court. In his federal habeas petition, applicant asserted that federal habeas counsel
had discovered unspecified "new" evidence supporting the claims he had presented in his
state habeas application. In August 2010, the federal district court stayed and abated the
federal habeas proceedings in light of the requirement that applicant exhaust all claims in
state court before presenting those claims in federal court. See 28 U.S.C. § 2254(b)(1)(A). 
The federal court's order comments that applicant had not identified with specificity the
"new" evidence he claimed his federal habeas counsel had only recently discovered, nor had
he explained why that evidence was unavailable during his first state habeas proceeding. The
court observed that it was "skeptical regarding [applicant's] purported 'new' evidence and
'unexhausted' claims." The court explained that new evidence to support a federal habeas
claim renders that claim "unexhausted" "[o]nly if the new evidence fundamentally alters or
changes the substance of the original claim." The court expressed its "doubts [that] the
"'new' evidence allegedly uncovered by [applicant's] federal habeas counsel was
unavailable, despite the exercise of due diligence, during the course of [applicant's] first state
habeas proceeding." More pointedly, the federal court stated, "As respondent correctly
points out, [applicant] tacitly admits the factual basis, if not all of the purportedly 'new'
evidence, which petitioner claims renders his ineffective assistance and mental retardation
claims 'unexhausted,' was available at the time of petitioner's first state habeas hearing." 
In an effort to avoid piecemeal litigation, however, the court ordered the case stayed and
abated, explaining its ruling, as follows:

 Given the past as prologue, this Court has no doubt a similar series of
protracted procedural maneuvers could be tried in this case should this Court
attempt to address the merits of petitioner's "unexhausted" claims herein
without first permitting petitioner a reasonable opportunity to "fairly present"
his "unexhausted" claims to the state court. This Court has little choice but to
stay this case to permit petitioner to return to state court and exhaust state
remedies on his purportedly "unexhausted" claims.


 If this Court were to deny petitioner's motion for stay at this juncture, there is
little doubt petitioner will simply wait until his claims herein have been
rejected on the merits by federal courts and return to state court where his
purportedly "unexhausted new" claims will likely be dismissed on state
procedural grounds. . . . At that juncture, petitioner would necessarily have
available to him a Rule 60 (b) motion asserting his "new" procedurally
dismissed claims. . . . 

The federal court instructed federal habeas counsel to file all necessary pleadings, including
a successive state habeas application, to enable applicant to "fairly present" the state courts
with applicant's new federal constitutional claims for relief. The court instructed applicant
to present the state habeas court with "everything" he desired the federal court to consider
in reviewing his federal constitutional claims. The present subsequent application followed.

II. The Subsequent State Application

 Applicant's present filing in this Court presents four claims that applicant contends
meet the bar on subsequent writs and should be addressed on the merits for the following
reasons:

 (1) The "fundamental rules of equity" demand consideration of his subsequent
writ because (a) his state habeas attorney failed to act as meaningful 11.071
counsel and (b) the procedural bar conflicts with the open courts provision of
the Texas Constitution on the facts of this case;

 

 (2) This Court should reopen his initial application so that he can fully litigate
his mitigation-evidence claim to present his new evidence of mitigation;

 

 (3) Alternatively, this Court should find that initial state habeas counsel's
"derelict representation" resulted in the complete abdication of that counsel,
making the current factual bases previously unavailable.


I disagree with applicant that any of the claims he presents in this subsequent application
establishes his three contentions described above or meets the bar on consideration of
subsequent writs.

 In one claim, applicant contends that the State failed to disclose Brady evidence, but
that claim rests on evidence that was presented at applicant's trial and there is nothing to
show that evidence was withheld from trial counsel. Furthermore, this claim is entirely new
and was not presented in the initial writ. Applicant provides nothing to explain why it was
not presented before or why it specifically would meet the procedural bar on subsequent
writs. 

 Applicant's remaining three claims rest with his assertions that he made in his initial
state writ contending that he is mentally retarded and that trial and state habeas counsel were
ineffective for failing to investigate and present mental-retardation evidence. Applicant's
claims rely largely on witness testimony and evidence from his initial state habeas application
that this Court has already determined does not establish mental retardation. Applicant's
current application presents affidavits from applicant's mother and a friend, both of whom
testified at his trial and communicated with state habeas counsel, and three affidavits from
individuals whose statements were obtained after the initial state habeas application was
denied and have never been presented to this Court. I discuss these affidavits separately
below.

 In his present application, applicant attaches his mother's affidavit, prepared in 2010. 
She states that at applicant's trial she told the jury that applicant was in special-education
classes at school. She states that applicant can read, "but not very well." She characterizes
applicant as "very slow" in that it takes "time for him to learn things." Describing her
husband, applicant's mother paints him as an alcoholic who could not keep a steady job and
who "beat" applicant with a belt and paddles for discipline. She says that his "friends were
always taking advantage of him" and that he was always their "fall guy." She acknowledges
that she told state habeas counsel that she did not believe applicant was mentally retarded,
but explains that she was unfamiliar with the term's legal definition. Though this affidavit
is more detailed than her previous statements, the content is largely redundant of her earlier
testimony and duplicates much of the evidence previously presented by Dr. Rosin's
assessment of applicant and his background.

 Applicant also attaches an affidavit from a friend, Manuel Torres, who testified at his
trial. Torres describes many of the same details as applicant's mother. He also describes
how applicant joined a gang after he dropped out of high school. He says applicant's
nickname was "Redrum," for murder spelled backwards. Again, this affidavit is more or less
a restatement of Torres's earlier testimony, duplicates much of the evidence presented by Dr.
Rosin's assessment, and contains negative information about applicant that may have been
more damaging than helpful to him.

 Applicant also attaches an affidavit prepared in 2010 from Dr. McQuilkin, who was
applicant's art teacher for one year in middle school. He describes applicant as having "very
poor academic and social skills." He explains that applicant's inability to articulate what he
saw "is indicative of low, high-order skills." He notes that applicant's inability to represent
a given object is "a profound indicator of cognitive handicap" and that applicant was in the
bottom five percent of all his students during his entire tenure as a teacher. He describes
applicant as easily influenced by schoolmates and a follower. He acknowledges, however,
that applicant had a reputation as a troublemaker. He says that applicant was retained in the
second and sixth grades. He reviewed the school-standardized-test results included in
applicant's school records, noting that they showed consistently low scores and that they
were compelling evidence of his "profoundly compromised intellectual abilities." Although
Dr. McQuilkin provides a first-hand personal report of his interactions with applicant, most
of his descriptions of applicant's intellectual abilities are similar to those that were presented
at the initial state habeas hearing through the testimony of Dr. Rosin. 

 Applicant's subsequent state application also includes an affidavit prepared in 2010
from Roberta Kerr, who was the special education coordinator at applicant's middle school. 
She states that applicant had a first-grade reading level when he was in middle school. She
describes applicant as a follower whose behavior was dependent on the company he kept. 
She says she did not think that he "was one who had the mental and social capabilities to
understand the consequences of his actions." She believes that applicant was "within the
range of mild mental retardation," as that term is used by educators. Although, like Dr.
McQuilkin, Ms. Kerr provides a first-hand personal report of her interactions with applicant,
most of her descriptions of applicant's intellectual abilities are substantially similar to those
that were presented at the initial state habeas hearing through Dr. Rosin. 

 Also included in this subsequent application is an affidavit prepared in 2010 from
Richard Woodward-Hetchler, who was applicant's co-worker at a restaurant in 1999 when
applicant was about 22 years old. He says that applicant could not read, did not understand
simple tasks in the kitchen, and did not understand the numbers on his paycheck. He
explains that it would take several rounds of instruction before applicant would understand
something. He describes applicant as "very naive," "gullible," and "easily led." Again, this
evidence of applicant's intellectual limitations was largely presented at the initial state habeas
hearing through Dr. Rosin.

 The school records attached to this subsequent application include the document
referring applicant to special-education classes in middle school. They show that he was
average or above average at math. He, however, ranked "below average" in his language
skills, in particular, he could not retain information, misunderstood what was said to him, and
confused numbers for letters. In describing applicant's social and emotional background, the
school records document a history of fighting and provoking others, and they additionally
describe applicant as destructive, disobedient, untruthful, and a thief. The school records
additionally show that applicant had a head injury when he was nine years old and that he had
convulsions, but the records contain no information about when this occurred or how that
may have impacted applicant's abilities. His IQ testing during middle school revealed a
verbal score of 75 and a performance score of 111, for a full-scale score of 91. The
recommendation of the educational diagnostician concluded that applicant's 

 present level of intellectual functioning is at the average range as measured by
the WISC-R. He appears to exhibit a learning disability in the areas of
Receptive (PPVT) and Expressive Language (WLPS), Reading
Comprehension (K-TEA), and in Reading, Math, and Spelling (WRAT).


He determined that this made applicant "eligible for special services as an LD student"
because his achievement in the specified areas is "more than one standard deviation below
the student's intellectual ability." The school records, therefore, indicate that applicant had
intellectual functioning at an average range based on his IQ scores. The records do not
indicate that applicant is mentally retarded, rather, they indicate that he has a "learning
disability."

 The records in the present application include a psychological report prepared by a
psychologist in 1994, when applicant was in ninth grade. The report describes applicant's
unstable family life. His father, an alcoholic, had given him alcohol in the past. Applicant's
father physically abused applicant's mother, and applicant had also tried to strike her. 

 The psychological report also describes applicant's social deficiencies. It indicates
that he consumed excessive amounts of alcohol once or twice a month. The psychologist
who prepared the report concluded that ninety-eight percent of people in applicant's age
group are better socially adjusted than applicant. The psychologist described applicant as
impulsive, depressed, pessimistic, and "oppositional." The psychologist categorized
applicant's type of emotional disturbance as "Depressive Disorder, Nos. Alcohol Abuse.
Conduct Disorder." He also classified applicant's emotional disturbance as "severe." He
said that these behavioral symptoms "are adversely affecting the subject's ability to perform
in the academic setting to a significant degree," and added that applicant would need "special
education assistance." 

 Applicant's school records from ninth grade show that he did know right from wrong
and that he could follow rules but was not following them. His disciplinary record showed
27 days in detention for a continuum of minor offenses, including insubordination with a
teacher and fighting. Viewed in the context of all the other evidence presented, the
psychologist's record and applicant's high school records are not beneficial to applicant
because they show that he was in special education primarily because of his disruptive
personality rather than due to mental retardation. 

 I conclude that most of the evidence regarding applicant's adaptive functioning was
presented in the initial state habeas application, so these new affidavits merely provide more
extensive and more detailed evidence to supplement the evidence already presented. 
Applicant has failed to show that any of the evidence that he now supplies in this subsequent
application is adequate to meet the procedural bar on subsequent writs.

 Applicant cannot show that his initial habeas counsel failed to raise these issues in the
initial application or that these claims otherwise satisfy the requirements of Article 11.071,
Section 5. See Tex. Code Crim. Proc. art. 11.071, § 5(a)(1), (a)(3). Indeed, this Court has
previously considered and rejected most of applicant's claims on the merits. This is not a
case in which applicant has been deprived of one meaningful opportunity to collaterally
challenge his death sentence. As such, I conclude that application of the procedural bar on
subsequent writs is required. I, therefore, respectfully concur with this court's dismissal of
this subsequent application.

Filed: October 23, 2013

Do Not Publish